# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| BON SECOURS MERCY HEALTH, INC., d/b/a MERCY HEALTH, | : :  :   Case No. 1:20-cv-919 |
| *Plaintiff*, | : :  Judge Jeffery P. Hopkins |
| vs. | : : |
| DEVONMD, LLC, *et al.*, | : : |
| *Defendants*. | : |

## OPINION & ORDER

As the unprecedented coronavirus (or COVID-19) pandemic quickly spread throughout the country and the world in 2020, healthcare organizations frantically tried to source personal protective equipment ("PPE") for patients and employees to protect against the transmission of the disease. Plaintiff Bon Secours Mercy Health, Inc., *dba* Mercy Health ("Mercy Health") was one such organization. In this action, Mercy Health asserts claims against PPE vendor Defendant DevonMD, LLC, and its founder, Defendant Dr. John A. Bennett, for events arising out of Mercy Health's efforts to procure PPE from DevonMD.

Before the Court are two motions: Defendants' motion to dismiss (Doc. 6) and Mercy Health's motion for leave to amend its complaint to add new claims and additional defendants (Doc. 27). For the reasons detailed below, Mercy Health's motion for leave to amend its complaint is **GRANTED**. Defendants' motion to dismiss is **DENIED** as moot. As a result, Defendants' motion to strike Mercy Health's supplemental memoranda in opposition to Defendants' motion to dismiss (Doc. 18) is also **DENIED** as moot.

I. BACKGROUND

A. Procedural History

Mercy Health filed this lawsuit in November 2020 in the Hamilton County Court of Common Pleas asserting claims for breach of contract, unjust enrichment, and fraud against Defendants DevonMD, LLC ("DevonMD"), and John A. Bennett, M.D. ("Dr. Bennett"). Compl., Doc. 2, PageID 63–67. Defendants subsequently removed the action to this Court and soon thereafter moved to dismiss all but one of the claims asserted in the lawsuit. *See* Docs. 1, 6. In its motion, Defendants ask this Court to (1) dismiss all claims against Dr. Bennett for lack of personal jurisdiction and for failure to state a claim upon which relief can be granted, and (2) dismiss the unjust enrichment and fraud claims against DevonMD for failure to state a claim. Doc. 6.

In July 2021, a few months after Defendant's motion to dismiss was fully briefed, Defendants filed a suggestion of bankruptcy (Doc. 21) indicating that Dr. Bennett had filed a voluntary petition under Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania. As a result, these proceedings were automatically stayed as to Dr. Bennett until March 2022, when Dr. Bennett's bankruptcy case was dismissed. *See* 11 U.S.C. § 362(a)(1); Doc. 24, PageID 402.

Immediately after the automatic stay as to Dr. Bennett was lifted, Mercy Health moved for leave to amend its complaint (Doc. 27) seeking to assert new claims against Dr. Bennett and DevonMD and to add new party defendants based on "significant facts" that surfaced during Dr. Bennett's bankruptcy proceedings. Doc. 27, PageID 527.

In the proposed amended complaint, Mercy Health seeks to add: DMD Medical Group, Inc. ("DMD"), the Trust of Frank A. Bennett for the Benefit of Lynn C. Bennett ("the

2

Trust"), John A. Bennett as Trustee of the Trust ("Dr. Bennett"), and Dr. Bennett's spouse, Nancy DeRocco ("DeRocco") (collectively, the "Proposed Defendants"). Doc. 27, PageID 527; Doc. 27-1. Mercy Health also wants to add claims for fraudulent transfers of assets and conspiracy under the Ohio Uniform Fraudulent Transfer Act ("OUFTA"), Ohio Revised Code § 1336.01 *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964. *Id.* Together with declaratory and injunctive relief, Mercy Health likewise seeks "a determination and declaration that DevonMD and Dr. Bennett are alter egos, which exposes Dr. Bennett to liability individually for breach of contract by piercing the corporate veil." *Id.* at PageID 527.

### B. Factual History[1]

Mercy Health is one of the largest healthcare systems in the United States. During the coronavirus pandemic, Mercy Health required PPE to protect against the transmission and spread of the virus to patients and employees. Proposed Am. Compl., Doc. 27-1. Mercy Health sought vendors that could provide an adequate source of PPE for its acute care hospitals and other medical facilities in its healthcare system. *Id.* ¶ 13.

DevonMD was a PPE vendor that offered to supply N95 face masks and isolation gowns to Mercy Health. *Id.* ¶ 14. In March 2020, Dr. Bennett contacted Mercy Health's Chief Supply Chain Officer, Daniel J. Hurry, to offer delivery of a certain number of N95 face masks within specific timeframes. *Id.* ¶ 15. Dr. Bennett and his accountant later communicated with Mr. Hurry and Mercy Health's Strategic Sourcing Officer, John Horne, about a quote for the N95 face masks and offered additional PPE, including surgical masks, isolation gowns, and

---

[1] In light of the procedural posture, the Court will rely on the factual allegations set forth in Mercy Health's proposed amended complaint. *See* Proposed Am. Compl., Doc. 27-1.

3

ventilators. *Id.* ¶ 16–18. Mr. Horne expressed an interest in Mercy Health purchasing up to 500,000 isolation gowns and advised that Mercy Health would need them within 7 to 10 days. *Id.* ¶ 20. Dr. Bennett advised the cost would be $2.00 per unit, plus $0.81 for shipment by air to meet the deadline. *Id.* Because of an expected surge in COVID-19 cases, Mercy Health would pay the extra cost. *Id.*

The next day, DevonMD's Vice President of Sales, Henry Schenk, emailed Mercy Health's Supply Chain Clinical Sourcing and Contracting Manager, Kathryn M. Wiesenberg, with two quotes for "FDA Approved Isolation Gowns." *Id.* ¶ 21. The cost would be $2.10 per unit for 500,000 isolation gowns and $2.00 per unit for 750,000 isolation gowns, plus shipping. *Id.* Expected delivery was within 14 days by air. *Id.* ¶ 23.

Dr. Bennett separately emailed Mr. Hurry to advise that DevonMD had ordered 75,000 isolation gowns that morning due to "the urgency and the 14 day delivery time." *Id.* ¶ 24. He requested confirmation that Mercy Health intended to proceed with purchase. *Id.* Mr. Hurry confirmed that Mercy Health intended to proceed. *Id.* ¶ 25. Mercy Health then approved the purchase of isolation gowns on the dates described below:

- April 2, 2020: Mercy Health approved the purchase of 750,000 FDA approved AAMI Level 1 isolation gowns from DevonMD at $2.81 per unit, for a total amount of $2,107,500, and for delivery within 14 days.

- April 3, 2023: Mercy Health approved the purchase of an additional 1,000,000 isolation gowns at $2.81 per unit, and for delivery within 14 days.

*Id.* ¶¶ 25–27. In total, Mercy Health ordered 1,750,000 isolation gowns from DevonMD for a cost of $4,917,500. *Id.* ¶ 27. Mercy Health made full payment for both orders by wire transfer on the dates the purchases were approved. *Id.* ¶ 29. Mercy Health represents further that Dr. Bennett and DevonMD knew and understood that Mercy Health required the isolation gowns to meet certain specifications and be approved for their intended use. *Id.* ¶ 28.

4

Alas, the isolation gowns were not delivered within 14 days as promised. And over the next several weeks, Dr. Bennett shared with Mercy Health varying estimated times of delivery and advised that the isolation gowns would be delivered piecemeal based on production estimates. *Id.* ¶¶ 31–38. For example, on April 14, 2020, Mr. Hurry emailed Dr. Bennett for a status update. *Id.* ¶ 34. Dr. Bennett explained by email, upon request of Mr. Hurry who was preoccupied with other emergencies at the time, "that factories were turning away his orders and that he was losing money on his gowns [] because the cost of materials and shipping had increased." *Id.* Dr. Bennett then added that "he required an additional $0.30 per gown to break even," and wanted to cancel Mercy Health's contract and return the money that he had already been paid. *Id.* Over the next hour, Dr. Bennett made several threats of cancelling Mercy Health's orders if they did not have time for a phone call. *Id.* ¶¶ 34–36.

Mr. Hurry, driven by the need for PPE, replied by email to Dr. Bennett indicating that Mercy Health "would agree to adjust the quantity of gowns to be delivered to account for the increased cost and allow Devon to break even, amounting to approximately 1,581,190 isolation gowns." *Id.* ¶ 38. A day later, DevonMD promised that 100,000 isolation gowns would be shipped to Mercy Health on April 15, 16, 18, 19, 21, and 23. *Id.* ¶ 39. Mercy Health later learned that Dr. Bennett did not have contracts with certain of the new factories on which he intended to rely at the time he made that representation. *Id.*

Indeed, it was not until May 5, 2020, that Mercy Health received its first shipment of PPE that had been promised for April delivery by DevonMD. *Id.* ¶ 40. The shipment included 18,880 lightweight, plastic, one time use gowns that were described on corresponding paperwork as "Disposable PE Gown (Civil use, Non-Medical)." *Id.* As alleged by Mercy Health, these were not the isolation gowns that were ordered and the gowns were not designed

5

to provide the level of protection from the virus that Mercy Health intended and required. *Id.* Eventually, to combat against the surge in the number of coronavirus cases and Defendants' failure to timely deliver the isolation gowns, Mercy Health was forced to order additional isolation gowns from other suppliers. *Id.* ¶ 41.

A few days after receiving the May shipment of PPE, Mr. Horne and other Mercy Health representatives initiated a phone conference with him to discuss the status of the contract. *Id.* ¶ 42. Subsequently, Mr. Horne emailed Dr. Bennett to reiterate that Mercy Health was cancelling its contract with DevonMD and requested a refund for the undelivered gowns. *Id.* Mercy Health agreed to pay for any gowns that were being shipped to Mercy Health so long as they conformed with the purchase requirements. *Id.* Despite Dr. Bennett's alleged representations to the contrary, *id.* ¶ 43, over the next two days, Mercy Health received shipments of only non-medical, open-back polyethylene aprons that were not designed to provide an adequate level of protection against the COVID-19 virus. *Id.* ¶ 44.

Consequently, Mr. Horne sought a refund on the purchase price on all undelivered PPE. *Id.* ¶ 45. Ignoring Mercy Health's directive canceling the contract, DevonMD continued to ship PPE to Mercy Health, which led Mercy Health to contact DevonMD on May 21, 2020, reiterating its demand that DevonMD cancel all shipments. *Id.* ¶¶ 46–47. DevonMD did not heed Mercy Health's instruction, so on June 10, 2020, Mercy Health again advised DevonMD that the PPE it had received did not conform to the purchase requirements, and the failure to timely deliver conforming goods substantially impaired the value of the contract. *Id.* ¶ 48–50. In the meantime, Mercy Health sequestered all goods received. *Id.*

As of July 2020, Mercy Health had received about 355,133 non-medical, open-back polyethylene aprons for a value of $1,104,464. *Id.* ¶ 51. Mercy Health alleges that these were

6

not designed to meet the specifications and approvals required to adequately protect against the COVID-19 virus. *Id.* Mercy Health had also received around 473,240 "purported cloth isolation gowns" for a value of $1,471,776. *Id.* ¶ 52. Because Mercy Health believed that these cloth gowns did not meet appropriate standards, Mercy Health, DevonMD, and Dr. Bennett agreed to have a testing agency of Defendant's choice test a sample of the gowns. *Id.* ¶¶ 52–53. Testing completed by Nelson Labs revealed that the purported cloth isolation gowns that Mercy Health received, but did not accept, failed to meet specification. *Id.* ¶ 55. Additionally, an estimated 752,817 isolation gowns with an approximate value of $2,341,260, were not delivered. *Id.* ¶ 56. Mercy Health alleges that, to date, Defendants have refused to return any portion of the purchase price. *Id.* ¶ 57.

## II. LAW AND ANALYSIS

### A. Mercy Health's Motion for Leave to Amend the Complaint

Because a district court should consider a pending motion to amend before dismissing a complaint, *Ellison v. Ford Motor Co.*, 847 F.2d 297, 300 (6th Cir. 1988), the Court will turn first to Mercy Health's motion for leave to amend its complaint. Mercy Health seeks leave to amend its complaint because of information gleaned from Dr. Bennett's bankruptcy proceedings. Defendants contend that the amendment is futile because personal jurisdiction is lacking over Dr. Bennett and the Proposed Defendants. *See* Doc. 28, PageID 636–40.

#### i. Good cause exists under Rule 16(b).

To begin, in a case where the deadline to amend has passed, the court must first consider whether the moving party has established good cause under Rule 16(b) to modify

7

the case schedule.² Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent"). *See Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003). In doing so, the court should assess "the moving party's diligence in attempting to meet the [case schedule]" as well as "possible prejudice to the party opposing the modification." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (citations omitted). Although neither party addresses Rule 16(b), the Court finds that good cause exists here. Mercy Health seeks to amend the complaint based on information acquired during Dr. Bennett's bankruptcy proceedings, which were not initiated until after Mercy Health filed the original complaint. Additionally, because of the bankruptcy proceedings and the pending motion to dismiss, this case had been statutorily stayed and the statute of limitations against reviving the litigation effectively tolled under 11 U.S.C. § 108(c), so any prejudice to Defendants would be minimal. With that in mind, the Court will turn to whether leave should be granted under Rule 15(a).

## ii. Amendment is proper under Rule 15(a)(2).

Rule 15(a)(2) embodies "a liberal amendment policy." *Brown v. Chapman*, 814 F.3d 436, 442 (6th Cir. 2016) (quoting *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002)). A party may generally amend its pleading once as a matter of course. But in all other cases, it may amend only with the opposing party's consent or the court's leave. Fed. R. Civ. P. 15(a). Rule 15(a)(2) provides that leave to amend should be freely given "when justice so requires," but it is within the district court's discretion to deny leave to amend where there is evidence of undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies, undue prejudice, or futility. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

---

² Though the calendar order (Doc. 12) was vacated by the previously assigned judge, it does not appear that the Court intended to extend deadlines that had since passed, unless addressed specifically in Plaintiff's unopposed motion for extension of deadlines. *See* Doc. 23; Notation Order, November 19, 2021.

At issue here is futility. In the Sixth Circuit, a proposed amendment is futile if the complaint, as amended, would not survive a motion to dismiss. *Neighborhood Dev. Corp. v. Advisory Council on Historic Pres.*, 632 F.2d 21, 23 (6th Cir. 1980) (citation omitted). Defendants argue that amendment would be futile because the Court lacks personal jurisdiction over Dr. Bennett and the Proposed Defendants. The futility argument is a non-starter at the onset because in arguing that amendment would be futile, Defendants ignore the key fact that Mercy Health not only seeks to add new defendants, but to also assert new claims against all defendants, including existing defendant DevonMD. Defendants do not contest personal jurisdiction over DevonMD, *see* Doc. 6, PageID 159, fn. 3, so the Court simply cannot conclude that amendment would be futile on lack of personal jurisdiction alone. Additionally, because lack of personal jurisdiction is a personal defense, *Alger v. Hayes*, 452 F.2d 841, 842–43 (8th Cir. 1972), DevonMD and Dr. Bennett lack standing to raise lack of personal jurisdiction on behalf of the Proposed Defendants. *See Lown Cos., LLC v. Piggy Paint, LLC*, No. 1:11-cv-911, 2012 WL 782671, at *2 (W.D. Mich. March 9, 2012).

That leaves Dr. Bennett. As discussed below, amendment as to him is not futile because personal jurisdiction over him is not lacking. Mercy Health alleged subject matter jurisdiction based on diversity in the original complaint. *See* Doc. 2. In the proposed amended complaint, Mercy Health asserts a claim under RICO, 18 U.S.C. § 1964, which presents a federal question. *See* Doc. 27-1. For the sake of completeness, the Court will address personal jurisdiction under both considerations.[3]

---

[3] As part of its analysis, the Court has considered the arguments set forth in Defendant's motion to dismiss to the extent that those arguments relate to whether this Court has personal jurisdiction over Dr. Bennett. Defendants generally refer to the arguments in the pending motion to dismiss in response to Mercy Health's motion for leave to amend its complaint. *See* Doc. 28.

a. <u>Diversity of Citizenship</u>

Personal jurisdiction exists in two forms: general and specific. A court may exercise general jurisdiction over a non-resident defendant whose contacts with the forum state are so "'continuous and systematic' as to render [the defendant] essentially at home" there. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In contrast, a court may exercise specific jurisdiction over a non-resident defendant whose contacts with the forum state are fewer or less intimate so long as the suit arises from or relates to those contacts. *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 262 (2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)).

When subject-matter jurisdiction is based on diversity of citizenship, courts look to the law of the forum state to determine whether personal jurisdiction exists. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000). A court may only exercise personal jurisdiction if it satisfies the requirements of the state's long-arm statute and constitutional due process. The Sixth Circuit has long recognized that Ohio's long-arm statute is not coterminous with federal constitutional limits.[4] *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012) (citing *Calphalon*, 228 F.3d at 721). That said, "in evaluating whether personal jurisdiction is proper under Ohio's long-arm statute, we have consistently focused on whether there are sufficient minimum contacts between the nonresident defendant and the forum state so as not to offend traditional notions of fair play and substantial justice." *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002). Thus, the focus here is on due process.

---

[4] The Ohio General Assembly amended Ohio's long-arm statute, effective as of April 7, 2021. *See* Am. H.B. 272, 133d Gen. Assemb. (Ohio 2020); Am. Sub. S.B. 10, 133d Gen. Assemb. (Ohio 2020). Because jurisdiction is determined as of the commencement of the action and commencement of this case preceded the amendment, this Court need not address the effect of the amendment in deciding whether personal jurisdiction exists here.

1. *Ohio's Long-Arm Statute*

Specific jurisdiction under Ohio law is provided by Ohio's long-arm statute, Ohio Rev. Code § 2307.382, which enumerates nine categories of conduct that subject an entity to personal jurisdiction in Ohio if a cause of action arises out of such conduct. Mercy Health argues that jurisdiction is appropriate under § 2307.382(A)(6) based on Dr. Bennett's tortious conduct, specifically his alleged fraud:

> (A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:
>
>> (6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when the person might reasonably have expected that some person would be injured thereby in this state;

O.R.C. § 2307.382(A)(6).

The Sixth Circuit has had limited opportunity to consider § 2307.382(A)(6) but acknowledged in *Schneider*, a case involving a non-resident defendant that drafted two letters containing false and misleading representations sent to an Ohio-based doctor, that "district courts have given it considerable attention and generally taken a broad approach to its application." 669 F.3d at 700 (citing *Grigor v. Starmark Hosp. Grp. LLC*, No. 2:10-cv-20, 2010 WL 2403137, at *5 (S.D. Ohio June 10, 2010)) (other citations omitted). Against that broad backdrop, this Court must decide (1) whether Dr. Bennett caused tortious injury to a person in Ohio by an act committed outside Ohio, and (2) whether he had a purpose to injure a person or persons when he might reasonably have expected that some person would be

11

consequently injured in Ohio.[5] *Chulsky v. Golden Corral Corp.*, 583 F. Supp. 3d 1059, 1073 (S.D. Ohio 2022) (citations omitted).

Mercy Health alleges that Dr. Bennett directed fraudulent statements to Mercy Health in Ohio, *see* Proposed Am. Compl., Doc. 27-1, ¶¶ 87–104, and that he and the other defendants engaged in fraudulent transfers of assets with the intent to deprive Mercy Health of its money in Ohio. *Id.* ¶¶ 105–19. The facts alleged related to the fraudulent statements are similar to those in *Schneider* and are enough to find that Ohio's long-arm statute, by § 2307.382(A)(6), confers jurisdiction over Dr. Bennett. Similar to the defendant in *Schneider*, Dr. Bennett is alleged to have made false or misleading representations to Mercy Health in relation to the sale of PPE. Based on the allegations, there were extensive communications between Dr. Bennett and Mercy Health about the purchase and shipment of PPE, so it is reasonable to find that Dr. Bennett knew Mercy Health operated in Ohio and that he could have reasonably expected that his fraudulent actions would cause injury in Ohio. *See Schneider*, 669 F.3d at 700–01; *see also Kehoe Component Sales, Inc. v. Best Lighting Prods.*, No. 2:08-cv-752, 2009 WL 2591757, at *5 (S.D. Ohio Aug. 19, 2009) ("[A] tort action can be brought in Ohio when tortious acts are intentionally and purposely directed toward a party located and injured in Ohio."); *Herbruck v. La Jolla Cap.*, 2000 WL 1420282, at *3 (9th Dist. Sept. 27, 2000) (finding that § 2807.382(A)(6) was satisfied when a defendant allegedly committed tortious acts (conversion, fraud, and civil conspiracy) outside Ohio by improperly transferring stock "while knowing full well that the stock involved was of an Ohio

---

[5] "For purposes of R.C. 2307.382, 'person' includes 'an individual, his executor, administrator, or other personal representative, or a corporation, partnership, association, or any other legal or commercial entity, who is a nonresident of this state.'" *Henderson v. SMC Prods.*, 2019-Ohio-5275, ¶ 16 (6th Dist.).

corporation."). The Court finds that the same is true of Plaintiff's remaining claims against Dr. Bennett.

Defendants seek to cast additional doubt as to this Court's jurisdiction over Dr. Bennett by relying on the judiciary-shield doctrine. Under this doctrine, "corporate employees performing acts in their corporate capacity are not subject to the personal jurisdiction of a court for such acts." *Heritage Funding & Leasing Co. v. Phee*, 120 Ohio App. 3d 422, 430 (10th Dist. 1997). There are, however, exceptions. Take for example the tort exception: "Ohio law provides that a corporate officer can be held personally liable for a tort committed while acting within the scope of his employment." *Yo-Can, Inc. v. Yogurt Exch.*, 2002-Ohio-5194, ¶ 47 (7th Dist.) (quoting *Atram v. Star Tool & Die Corp.*, 64 Ohio App.3d 388, 393 (8th Dist. 1989)). So, if a non-resident defendant commits tortious acts in his corporate capacity, the tort exception to the fiduciary-shield doctrine applies when ascertaining whether personal jurisdiction exists.

Defendants argue that the tort exception cannot apply because Mercy Health's fraud claim fails as a matter of law. But this puts the cart before the horse. Jurisdiction is not defeated "by the possibility that the averments might fail to state a cause of action on which [Mercy Health] could actually recover." *Bell v. Hood*, 327 U.S. 678, 682 (1946). Indeed, "a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). Thus, in viewing the proposed amended complaint in a light most favorable to Mercy Health, the tort exception to the fiduciary-shield doctrine applies here.

Mercy Health has therefore made the requisite prima facie showing that personal jurisdiction over Dr. Bennett exists under Ohio's long-arm statute. *Clendenning v. Newpage*

13

*Corp.*, No. 3:09-cv-493, 2010 WL 3991949, at *7 (S.D. Ohio Oct. 12, 2010) ("When there is no evidentiary hearing, as is the case here, the plaintiff must make only a prima facie showing [that jurisdiction exists] and the pleading and affidavits, when in conflict, are viewed in a light most favorable to the plaintiff.").

2.  *Constitutional Due Process*

Having found personal jurisdiction to exist under Ohio's long-arm statute, the Court next considers constitutional due process. At this step, courts evaluate whether the defendant has sufficient minimum contacts with the state so that personal jurisdiction over the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). To make this determination, courts in this Circuit employ the three-prong test set out in *S. Mach. Co. v. Mohasco Indus.*, 401 F.2d 374, 381 (6th Cir. 1968):

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id*. The Court will sequentially consider each of these prongs.

i.  Purposeful Availment

As to the first prong, the Court must decide whether Dr. Bennett has "purposefully avail[ed] himself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). This requirement seeks to ensure that the defendant will not be subject to the jurisdiction of a forum solely as a result of "random, fortuitous, or attenuated contacts." *Rudzewicz*, 471 U.S. at 475. This prong is readily

14

satisfied by the fraudulent communications that Dr. Bennett allegedly directed to Mercy Heath in Ohio.

The effects test instructs the Court's analysis. Under this test, "personal jurisdiction exists where an individual purposefully directs activities toward the forum state with the intent to cause harm there." *Scotts Co. v. Aventis S.A.*, 145 F. App'x 109, 113 (6th Cir. 2005) (citing *Calder v. Jones*, 465 U.S. 783 (1984)). Here, Dr. Bennett allegedly directed false and misleading communications to Mercy Health in Ohio. These communications, at least in part, allegedly induced Mercy Health (1) into entering a contract with DevonMD, (2) into modifying the terms of that contract, and (3) into refraining from cancelling the contract or demanding or pursuing a return of the purchase price. Proposed Am. Compl., Doc. 27-2, ¶ 97. The communications between Mercy Health and Dr. Bennett were not incidental. Instead, they form the "heart of the lawsuit" and satisfy the first prong. *See e.g.*, *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001) ("[T]he actions of sending false information into Tennessee by phone and fax had foreseeable effects in Tennessee and were directed at individuals in Tennessee. These false representations are the heart of the lawsuit — they were not merely incidental communications sent by the defendant into Tennessee."); *Chulsky*, 583 F. Supp. 3d at 1076–77.

ii. Arising From

To meet the second prong, the Court must answer this question in the affirmative: does the cause of action arise from Dr. Bennett's activities in the forum state? *S. Mach. Co.*, 401 F.3d at 381. The Sixth Circuit has articulated the standard "in a number of different ways, such as whether the causes of action were 'made possible by' or 'lie in the wake of' the defendant's contacts or whether the causes of action are 'related to' or 'connected with' the

15

defendant's contacts with the forum state." *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007) (citations omitted). Regardless of the manner under which it is applied, this remains a "lenient standard." *Id.* (citing *Bird*, 289 F.3d at 875).

Mercy Health satisfies this prong. Mercy Health alleges various claims against Dr. Bennett and these claims allow this Court to readily conclude that those claims arise from Dr. Bennett's Ohio-directed communications. Dr. Bennett allegedly directed fraudulent or misleading representations to Mercy Health in Ohio and those communications caused injury to Mercy Health within the forum state. At the very least, these communications form the basis of Mercy Health's fraud claim. The lenient standard is therefore met here.

### iii. Reasonableness

The third and final prong dictates that "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *S. Mach.*, 401 F.2d at 381. As is the case here, where the first two prongs are met, "an inference of reasonableness arises" and "only the unusual case will not meet this third criteria." *Theunissen v. Matthews*, 935 F.2d 1454, 1461 (6th Cir. 1991) (quoting *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1170 (6th Cir. 1988)). There are four factors to consider in deciding whether the exercise of jurisdiction is reasonable: "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy." *Air Prods.*, 503 F.3d at 554–55 (citation omitted).

Though he does not allege any burden, the Court acknowledges that there would likely be some burden on Dr. Bennett to appear in Ohio. That said, the effects of any burden can be mitigated or minimalized. Beyond this, Ohio has a strong interest in adjudicating this suit

because Mercy Health maintains its principal place of business in Ohio and asserts a claim under the Ohio Uniform Fraudulent Transfer Act. And Mercy Health has an interest in obtaining convenient and effective relief in Ohio. These factors therefore favor the exercise of jurisdiction over Dr. Bennett. The fourth factor, which relates to other states' interest, is neutral. Mercy Health has presence in other states, but given that they are principally located in Ohio, no other state appears to possess an interest in securing efficient resolution.

The Court therefore finds that Mercy Health has also made a prima facie showing that jurisdiction would comport with constitutional due process. Personal jurisdiction is thus not lacking and amendment would not be futile on these grounds.

### b. Federal Question

Even if diversity were lacking, this Court would have an alternative path toward personal jurisdiction through the RICO claim, which presents a federal question. 28 U.S.C. § 1331. And as discussed below, because of the Sixth Circuit's holding in *Peters Broad Eng'g, Inc. v. 24 Cap., LLC*, 40 F.4th 432, 440–41 (6th Cir. 2022), a case decided after these motions were fully briefed, Mercy Health can establish personal jurisdiction over Dr. Bennett on the federal claims through nationwide service of process.[6]

The Sixth Circuit in *Peters* addressed a circuit-split that presented a question of first impression for the Circuit: does 18 U.S.C. § 1965(b) or (d) govern the exercise of personal jurisdiction over out-of-district defendants in RICO cases?

> (a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

---

[6] This Court can exercise supplemental jurisdiction over Mercy Health's state-law claims. 28 U.S.C. § 1367.

17

> (b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.
>
> . . .
>
> (d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

18 U.S.C. § 1965.

A minority of circuits had held that § 1965(d) governs service over out-of-district defendants, while the majority of circuits found § 1965(b) to be the governing provision. *Peters*, 40 F.4th at 437. In the end, the Sixth Circuit adopted the majority forum-state approach, finding that § 1965(a) provides for venue, while § 1965(b) "extends personal jurisdiction through nationwide service of process over 'other parties residing in any other district,' as long as venue is proper through (a) with that initial defendant and the 'ends of justice' require it." *Id.* at 440–41. What this means is that when there is "at least one defendant with traditional forum state contacts," § 1965 confers personal jurisdiction over the remaining defendants when doing so would satisfy the "ends of justice." *Id.* That initial hurdle is easily cleared here because Defendants do not contest that this Court has personal jurisdiction over DevonMD. *See* Doc. 6, PageID 159, fn. 3. Thus, this Court is left only to decide whether conferring personal jurisdiction over the remaining defendants, including Dr. Bennett, is in the interest of justice.

The Sixth Circuit in *Peters* declined to reach this inquiry because no initial defendant met the requirements of § 1965(a). *Peters*, 40 F.4th at 440, n.4. Other courts within this Circuit that have considered the meaning of this language ultimately elected to rely on the Tenth

18

Circuit's decision in *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1232 (10th Cir. 2006). *See e.g.*, *Rexam Healthcare Packaging, Inc. v. Osiris Med., Inc.*, No. 3:09-cv-1584, 2010 WL 819063, at *5 (N.D. Ohio Mar. 9, 2010); *Doe v. Varsity Brands, LLC*, No. 1:22-cv-02139, 2023 WL 4935933, at *15–17 (N.D. Ohio Aug. 2, 2023); *Anthony v. Over*, No. 3:22-cv-416, 2023 WL 6307960, at *3–5 (E.D. Tenn. Sept. 27, 2023). In doing so, these courts have applied "a flexible concept that depends on the unique facts and circumstances of each case." *Anthony*, 2023 WL 6307960, at *3. This Court will do the same.

There are several factors that courts consider when deciding whether conferring personal jurisdiction meets the "ends of justice." Those factors include: "the desirability of having the whole action litigated in one court," "the cost of the delay involved in transferring the case to another forum," and "the general balance of hardships between plaintiff and defendant." *Rexam*, 2010 WL 819063, at *5 (citations omitted). Based on the information known to the Court right now, these considerations weigh toward the ends of justice.

Dismissal of certain defendants at this stage would, as in *Rexam*, "potentially require the claims in this action to be simultaneously litigated." 2010 WL 819063, at *5. And, a transfer would not only be of great expense, but it would add to the extraordinary delay that has already occurred in this four-year-old case because of the bankruptcy stay as to Dr. Bennett and the transfer of this case to the undersigned.[7] Any hardship would be minimal given Dr. Bennett's relationship to DevonMD and the Proposed Defendants. With the known information, conferring personal jurisdiction meets the ends of justice.

---

[7] Upon the appointment of the Hon. Jeffery P. Hopkins on December 16, 2022, the instant case was reassigned for all further proceedings from the Hon. Michael R. Barrett in an order signed by then Chief Judge Algenon L. Marbley on December 21, 2022. The motions pending in this case were among more than two hundred others pending in civil cases reassigned to the undersigned. Doc. 31.

### III. CONCLUSION

For these reasons, Mercy Health's motion for leave to amend complaint (Doc. 27) is **GRANTED**. Further, Defendants' motion to dismiss is **DENIED** as moot as the amended complaint will supersede the original complaint. *Crawford v. Tilley*, 15 F.4th 752, 759 (6th Cir. 2021) ("The general rule is that filing an amended complaint moots pending motions to dismiss."). Defendant's motion to strike (Doc. 18) is likewise **DENIED** as moot. Mercy Health is **ORDERED** to file its amended complaint within 7 days.

**IT IS SO ORDERED.**

March 3, 2025

Jeffery P. Hopkins
United States District Judge